STATE OF NORTH CAROLINA v. KENNETH THOMAS FORTE

No. COA09-1591

(Filed 7 September 2010)

**1. Fiduciary Relationship— exploitation of elder adult—sufficiency of evidence—elder adult—caretaker**

The trial court did not err by failing to dismiss all three charges of exploitation of an elder adult based on alleged insufficient evidence of an elder adult and a caretaker. There was sufficient evidence showing that the victim, who was older than 60 and needed extensive assistance from others, was an elder adult and that defendant had assumed the responsibility for the care of the victim.

**2. Witnesses— competency—elderly witness**

The trial court did not abuse its discretion in an exploitation of an elder adult case by allowing the elderly victim to testify on behalf of the State. The trial court's findings and personal observation led it to determine that the victim was competent to testify as a witness. The witness's testimony demonstrated his ability to distinguish between the truth and a lie. Further, it is not unusual for an elderly individual to have some difficulty in responding coherently to all of the questions asked during *voir dire*.

Appeal by Defendant from judgment entered 16 June 2009 by Judge Joseph Crosswhite in Richmond County Superior Court. Heard in the Court of Appeals 9 June 2010.

*Attorney General Roy Cooper, by Assistant Attorney General M. Lynne Weaver, for the State.*

*Smith, James, Rowlett & Cohen, L.L.P., by Seth R. Cohen, for Defendant.*

STEPHENS, Judge.

*I. Procedural History*

On 2 February 2009, Defendant Kenneth Thomas Forte was indicted on three counts of exploitation of an elder adult for offenses allegedly committed against Ernest Lindsey between 20 December 2003 and 1 June 2006.[1] The case was tried before a jury during the 8 June 2009 criminal session of Richmond County Superior Court. On 16 June 2009, the jury returned verdicts finding Defendant guilty on all charges. The trial court sentenced Defendant to 60 months probation and ordered him to pay $35,000 in restitution. Defendant gave oral notice of appeal in open court.

*II. Evidence*

The evidence presented at trial tended to show the following: Defendant, a woodworker, moved to Richmond County, North Carolina, in 1995 to care for his aging parents. Defendant's father

---

1. Two counts were in violation of N.C. Gen. Stat. § 14-32.3 (2003) and one count was in violation of N.C. Gen. Stat. § 14-112.2 (2005). Effective 1 December 2005, N.C. Gen. Stat. § 14.32.3 was repealed and replaced by N.C. Gen. Stat. § 14-112.2. The statutes are substantially similar except that N.C. Gen. Stat. § 14.32.3 required that the offender be a "caretaker" while N.C. Gen. Stat. § 14-112.2 requires that the offender be one who "stands in a position of trust and confidence with an elder adult" or "has a business relationship with an elder adult."

STATE v. FORTE

[206 N.C. App. 699 (2010)]

introduced Defendant to Lindsey in 1998 when Lindsey was either 88 or 98 years old.[2] At that time, Lindsey hired Defendant to renovate a beauty shop located on Lindsey's property. During the renovation, Defendant drove Lindsey to Charlotte, North Carolina, to buy items for the beauty shop. After he completed work on the beauty shop, Defendant continued to perform renovations, installations, and various other maintenance projects on Lindsey's home and property, including putting new siding and shingles on Lindsey's home, putting a gate in Lindsey's fence, and installing a handrail in Lindsey's home.

During the time the offenses were allegedly committed, Lindsey lived alone in his home. Lindsey's youngest sister, Laura Cromer, lived next door. Ms. Cromer cooked and brought meals to Lindsey on a daily basis. Shane Martin, a family friend, helped Lindsey maintain his truck and drove Lindsey to get groceries until Mr. Martin died in 2004. Thereafter, Defendant assisted Lindsey with grocery shopping.

Lindsey had not driven since 2000, and Defendant drove Lindsey wherever Lindsey needed or wanted to go including various grocery stores, the Alcoholic Beverage Control (ABC) package store, a pawn shop, and the courthouse to file his will. Defendant also took Lindsey to purchase dentures and a headstone. Moreover, Defendant performed a pedicure on Lindsey on at least one occasion.

The State introduced 92 checks totaling $45,412.26 written from Lindsey to Defendant between 30 December 2003 and 1 June 2006. Checks written from Lindsey to Defendant between April 2002 and December 2003 were also admitted. According to Defendant, some of the checks were to reimburse Defendant for purchases Defendant made for Lindsey, including items purchased and used to maintain Lindsey's home and yard. Defendant also testified that Lindsey gave him a series of checks written for $1,800 each and also one check written for $1,400 for Defendant to cash and give the money to Lindsey so Lindsey could purchase another vehicle. Defendant further indicated that he cashed other checks written from Lindsey to him and then gave the cash to Lindsey because Lindsey did not have a bank account in Ellerbe, where he lived.

Defendant testified that he did not balance Lindsey's checkbook or see Lindsey's bank statements, although he assisted Lindsey in paying utility bills beginning in 2002. According to Defendant,

---

2. Delores Bordeaux, Lindsey's daughter, testified that Lindsey's official birth records show that he was born in 1910, but family members believed he may have been born 10 years earlier in 1900, based on accounts from Lindsey and other family members.

STATE v. FORTE

[206 N.C. App. 699 (2010)]

Lindsey wrote the numeric amounts on checks and signed the checks while Defendant filled in the text portion and mailed them.

Ms. Bordeaux moved to St. Louis, Missouri in 1972 but visited her father in North Carolina at least twice a year. Ms. Bordeaux testified that she thought her father was capable of managing his own affairs between 20 December 2003 and 1 June 2006, but that before Defendant became involved in her father's life, Hattie Fairley cashed checks for her father "for a number of years" because there was no local branch of his bank, Ms. Cromer provided care and assistance for her father, Mr. Martin drove her father to go grocery shopping, and the Meals on Wheels program brought her father meals.

Ms. Bordeaux became aware that Defendant was assisting Lindsey in paying bills because she shared a joint checking account with Lindsey. Ms. Bordeaux indicated that in 2004, she noticed that large amounts of money were unaccounted for in their joint checking account, and she discovered checks signed by her father written to Defendant for cash in large amounts. Ms. Bordeaux testified that she questioned Defendant several times regarding the checks written on Lindsey's account. She stated that her father seemed confused about what was happening. Thereafter, Ms. Bordeaux and her husband requested that Defendant send copies of all of Lindsey's bills to Ms. Bordeaux. Defendant indicated that he would do so, but never did. Ms. Bordeaux then requested that Defendant give Lindsey's bills to Ms. Cromer. Defendant did not comply with this request either. Ms. Bordeaux testified that she and her husband asked Defendant not to write any checks over $500 for cash, and Ms. Bordeaux began writing checks for cash to herself to limit the amount of money that Defendant could withdraw from Lindsey's account. Ms. Bordeaux testified that when Defendant was not responsive to her requests, she and her husband sent a certified letter to Defendant and a copy to Lindsey, dated 24 April 2006, requesting that Defendant refrain from any further involvement in Lindsey's finances and that Defendant not receive any check from Lindsey made payable to him in an amount greater than $500.

In June of 2006, after Defendant had been unresponsive to her repeated requests to refrain from involvement in Lindsey's finances, Ms. Bordeaux and her husband went to the Richmond County Sheriff's office with copies of checks written by Lindsey to Defendant and expressed concern over the checks. Detective Wendell Sessoms spoke with the Bordeauxs, took the checks, and went to Lindsey's

home to ask Lindsey about his checking account. Thereafter, Detective Sessoms contacted Defendant who agreed to speak with him at the Sheriff's Department. Detective Sessoms questioned Defendant regarding Lindsey's checking account and his relationship with Lindsey and arrested him shortly thereafter.

Ms. Bordeaux testified that she did not realize her father needed live-in care until after the charges were brought against Defendant in 2006 and that Lindsey appeared much thinner and frailer by 2006. Ms. Bordeaux believed that her father understood what he was doing "to an extent" and was "fairly" mentally alert in 2006, although he could not coherently explain to her the relationship he had with Defendant. She noticed that his faculties gradually declined beginning in 2006. In 2007, Lindsey signed a power of attorney naming Ms. Bordeaux as his attorney-in-fact. In that same year, Doris Lindsey, Ms. Bordeaux's cousin, moved in with Lindsey to take care of him full-time. At the time of trial, Lindsey had other hired caregivers who assisted with his personal care each day.

### III. Discussion

### A. Motion to Dismiss

[1] By his first and second arguments, Defendant contends that the trial court erred by failing to dismiss all three charges of exploitation of an elder adult for insufficient evidence of the charges. We disagree.

In evaluating a motion to dismiss for insufficiency of the evidence, the task of a reviewing court is to

> examine the evidence adduced at trial in the light most favorable to the State to determine if there is substantial evidence of every essential element of the crime. Evidence is 'substantial' if a reasonable person would consider it sufficient to support the conclusion that the essential element exists.

*State v. McKinnon*, 306 N.C. 288, 298, 293 S.E.2d 118, 125 (1982). The question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Evidence sufficient to "carry a case to the jury" must be more than a "mere scintilla" and must generally be "any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction[.]" *State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (quotation marks and citations

omitted). The court does not weigh the evidence and any discrepancies or contradictions in the evidence are to be resolved by the jury.

*Id.* at 67, 296 S.E.2d at 652.

A person is guilty of exploitation of an elder adult under N.C. Gen. Stat. § 14-32.3[3] if

> that person is a caretaker of a[n] . . . elder adult who is residing in a domestic setting, and knowingly, willfully and with the intent to permanently deprive the owner of property or money (i) makes a false representation, (ii) abuses a position of trust of fiduciary duty, or (iii) coerces, commands, or threatens, and, as a result of the act, the . . . elder adult gives or loses possession and control of property or money.

N.C. Gen. Stat. § 14-32.3(c). Under N.C. Gen. Stat. § 14-112.2,[4]

> [i]t is unlawful for a person: (i) who stands in a position of trust and confidence with an elder adult . . ., or (ii) who has a business relationship with an elder adult . . . to knowingly, by deception or intimidation, obtain or use, or endeavor to obtain or use, an elder adult's . . . funds, assets, or property with the intent to temporarily or permanently deprive the elder adult . . . of the use, benefit, or possession of the funds, assets, or property, or to benefit someone other than the elder adult . . . .

N.C. Gen. Stat. § 14-112.2(b).

### 1. Elder Adult

Defendant first argues that the State did not produce substantial evidence that Ernest Lindsey was an "elder adult."

Under both the repealed and the current statutes, an "elder adult" is defined as "[a] person 60 years of age or older who is not able to provide for the social, medical, psychiatric, psychological, financial, or legal services necessary to safeguard the person's rights and resources

---

3. Defendant was charged with two counts of exploitation of an elder adult under this repealed version of the statute, which applied to offenses committed between 1 December 1995 and 30 November 2005, for Defendant's actions which occurred between 30 December 2003 through 30 November 2005.

4. Defendant was charged with one count of exploitation of an elder adult under the present version of the statute, which applies to offenses committed on or after 1 December 2005, for Defendant's actions which occurred between 1 December 2005 and 6 May 2006.

and to maintain the person's physical and mental well-being." N.C. Gen. Stat. § 14-112.2(a)(2); N.C. Gen. Stat. § 14-32.3(d)(4).

On this issue, the State presented evidence that tended to show the following: Lindsey was either 99 or 109 at the time of trial and had not driven a vehicle since 2000. Ms. Cromer lived next door to Lindsey and assisted him with paying his bills, brought him meals, and bought him groceries. The Meals on Wheels Program delivered a mid-day meal to Lindsey on a daily basis. Mr. Martin assisted Lindsey by driving him places, maintaining his vehicles, and grocery shopping for him. Before Defendant's arrival, Lindsey's friend cashed checks for him.

Defendant similarly cashed checks for Lindsey and, beginning in 2002, assisted Lindsey with paying bills by filling out checks that Lindsey then signed. Defendant also indicated that Lindsey wrote checks to him which he cashed and then gave the cash to Lindsey. Defendant drove Lindsey wherever he needed or wanted to go, including various grocery stores, the ABC store, the pawn shop, and Wal-Mart. Defendant also helped Lindsey with personal hygiene and made doctor and dentist appointments for him.

This evidence tends to show that Lindsey was older than 60 and needed extensive assistance from others to "safeguard [his] rights and resources and to maintain [his] physical and mental well-being." N.C. Gen. Stat. § 14-112.2(a)(2); N.C. Gen. Stat. § 14-32.3(d)(4).

Defendant argues further, however, that Ms. Bordeaux's testimony that her father was capable of managing his own affairs demonstrated that Lindsey was not an elder adult within the meaning of the statute. We reiterate the well-established principle that neither the trial court nor this Court may weigh the evidence. *Earnhardt*, 307 N.C. at 67, 296 S.E.2d at 652. While Ms. Bordeaux's testimony may be some evidence tending to show that Lindsey was able to provide for his own well-being, when all the evidence presented at trial is viewed in the light most favorable to the State, as it must be on a motion to dismiss for insufficient evidence, *McKinnon*, 306 N.C. at 298, 293 S.E.2d at 125, we conclude there was sufficient evidence from which a jury could find that Lindsey was an "elder adult." Accordingly, the trial court did not err in denying Defendant's motion to dismiss. Defendant's argument is overruled.

## 2. Caretaker

Next, Defendant argues there was insufficient evidence that Defendant was a "caretaker" of Lindsey.

A "caretaker" is defined as "[a] person . . . who has assumed the responsibility for the care of a[n] elder adult voluntarily or by contract." N.C. Gen. Stat. § 14-32.3(d)(1).

On this issue, the State presented evidence that tended to show the following: Ms. Bordeaux testified that Defendant performed odd jobs for Lindsey, ran errands for Lindsey, drove Lindsey to different places, wrote checks for Lindsey, visited with Lindsey, and cut Lindsey's toenails on at least one occasion. Ms. Cromer testified that although she did not witness Defendant provide any personal care for Lindsey, Lindsey and Defendant had a close relationship and Defendant was around Lindsey's home with increasing frequency.

Defendant testified that he took Lindsey numerous places to buy groceries, alcohol, and other supplies and necessities. Defendant also took Lindsey to purchase a headstone and dentures. Defendant purchased items for Lindsey and completed renovations and other home projects on Lindsey's property. Defendant also took Lindsey to file his will and made doctor and dentist appointments for him. Moreover, Defendant was intricately involved in helping Lindsey manage his financial affairs by cashing checks for Lindsey and assisting Lindsey with paying bills.

Defendant argues that these "limited activities" are not sufficient to transform the "friendly relationship" between him and Lindsey into that of caretaker and charge. We disagree. We conclude the evidence was sufficient to allow the jury to find that Defendant had "assumed the responsibility for the care" of Lindsey. N.C. Gen. Stat. § 14-32.3(d)(1). Accordingly, as the State offered sufficient evidence that Defendant was a "caretaker" of Lindsay, the trial court did not err in denying Defendant's motion to dismiss. Defendant's argument is overruled.

### B. Witness Competency

[2] Finally, Defendant contends that the trial court erred by allowing Lindsey to testify on behalf of the State. Specifically, Defendant contends that Lindsey was incapable of expressing himself concerning the matter at issue so as to be understood, and that his presence before the jury was so prejudicial as to deny Defendant a fair trial. We disagree.

Generally, every person is competent to be a witness unless disqualified by the Rules of Evidence. N.C. Gen. Stat. § 8C-1, Rule 601(a) (2009). However,

> [a] person is disqualified to testify as a witness when the court determines that he is (1) incapable of expressing himself concerning the matter as to be understood, either directly or through interpretation by one who can understand him, or (2) incapable of understanding the duty of a witness to tell the truth.

N.C. Gen. Stat. § 8C-1, Rule 601(b) (2009). "This subdivision (b) establishes a minimum standard for competency of a witness . . . ." *State v. DeLeonardo*, 315 N.C. 762, 766, 340 S.E.2d 350, 354 (1986). "The issue of the competency of a witness to testify rests in the sound discretion of the trial court based upon its observation of the witness." *State v. Rael*, 321 N.C. 528, 532, 364 S.E.2d 125, 128 (1988). "Absent a showing that a trial court's ruling as to competency could not have been the result of a reasoned decision, it will not be disturbed on appeal." *Id.*

In this case, after observing Lindsey testify on *voir dire*, the trial court found as follows:

> In rendering this decision, I have reviewed the *Davis* case. My understanding is Rule 601(b) says it does not ask how bright, how young or how old a witness is. Instead, the question is does the witness have the capacity to understand the difference between telling the truth and lying.

> In the Court's discretion, I do find that [Lindsey is] capable of telling the difference between the truth and a lie.

> Further, in the Court's discretion, under this standard, I find that he does have the capacity to testify for the State in this matter.

Thus, based on its findings and personal observation of Lindsey, the trial court determined that Lindsey was competent to testify as a witness in this case. Although the trial court did not make a specific finding as to whether Lindsey was capable of expressing himself so as to be understood concerning the matters about which he was to testify, the findings made by the trial court and its conclusion that he was competent clearly establish that the trial court exercised its discretion in declaring Lindsey competent as a witness. *See State v. Eason*, 328 N.C. 409, 427, 402 S.E.2d 809, 818 (1991) ("Although the trial court did not make a specific finding as to whether the child was capable of expressing herself concerning the matters as to which she

was to testify, the findings made by the trial court and its conclusion that she was competent clearly establish that the trial court exercised its discretion in declaring her competent as a witness."). "As it is clear that the trial court exercised its discretion in declaring [Lindsey] competent, its determination in this regard must be left undisturbed on appeal, absent a showing that the trial court's ruling as to the competency of the witness could not have been the result of a reasoned decision." *Id.* (citing *State v. Spaugh,* 321 N.C. 550, 364 S.E.2d 368 (1988); *Rael,* 321 N.C. 528, 364 S.E.2d 125; *State v. Hicks,* 319 N.C. 84, 352 S.E.2d 424 (1987)).

"Rule 601(b) does not ask how bright, how young, or how old a witness is." *State v. Davis,* 106 N.C. App. 596, 605, 418 S.E.2d 263, 269 (1992). In determining the competency of a young child or a developmentally delayed individual to testify, this Court has stated that "[i]t matters not that some of the witness's answers during *voir dire* are ambiguous or vague or that they are unable to answer some of the questions which are put to them" as such performance is not unusual when the witness is a young child or a developmentally delayed individual. *State v. Oliver,* 85 N.C. App. 1, 8, 354 S.E.2d 527, 532 (1987) (citing *State v. Gordon,* 316 N.C. 497, 503, 342 S.E.2d 509, 512 (1986)).

In *Oliver,* the prosecuting witness, a developmentally delayed 16 or 17 year old girl, was unable to testify how long it had been since August of that year, was unable to answer with specificity where she lived in her town or how long she had lived there, and did not answer several questions at all. However, this Court concluded that

the record show[ed] there was sufficient evidence for the trial court to determine she was competent to testify [as] . . . [s]he was able to tell the court where she went to school, name her teachers, tell how old she was, when her birthday was, and what month it was during the trial. [Furthermore, s]he said she knew it was bad to tell a lie and was able also to say whether a statement told her was a lie or the truth.

*Oliver,* 85 N.C. App. at 8-9, 354 S.E.2d at 532.

In *Gordon,* the prosecuting witness was a six or seven year old girl. Although the Court acknowledged "that some of the witness' answers during the *voir dire* were ambiguous and vague [and that] she was completely unable to answer some of the questions which were put to her[,]" *Gordon,* 316 N.C. at 503, 342 S.E.2d at 512, this Court found no abuse of discretion in the trial court's allowing the

witness to testify as "[t]he record indicate[d] that the witness was clearly able to differentiate between a true statement and one which was false. Furthermore, she showed a general knowledge of the difference between right and wrong." *Id.* at 502-03, 342 S.E.2d at 512.

During the *voir dire* hearing in this case, Lindsey correctly testified to his full name, his birth date, and where he lived. He was able to correctly identify his sister, his son-in-law, Defendant, and his own signature. Lindsey testified that he understood that he was at the courthouse, that a trial was taking place, and that he understood his duty to tell the truth. Lindsey's testimony further demonstrated his ability to tell the truth from a lie.

Defendant argues that Lindsey's testimony shows he was "clearly befuddled" and that at first he "wasn't even sure he knew [Defendant]." Lindsey's testimony further revealed that Lindsey did not know if he had a checking account, if Defendant had helped him purchase a truck, or if Defendant had clipped his toenails. Defendant notes that "[t]he main thing Mr. Lindsey seemed to remember about [Defendant] was his 'beautiful mustache.' "

However, while some of Lindsey's answers during the *voir dire* were ambiguous and vague, and he was unable to answer some of the questions which were put to him, it would not be unusual for an elderly individual to have some difficulty in responding coherently to all of the questions asked during *voir dire*. As in *Oliver* and *Gordon*, Lindsey did, at certain points in his testimony, show an understanding of the difference between truth and falsehood and of the importance of telling the truth. This testimony supports the implicit finding of the trial judge—who was present and able to observe Lindsey's demeanor firsthand—that the witness was competent. We are therefore unable to say that the trial judge abused his discretion in finding Lindsey competent to testify at trial. This assignment of error is overruled.

For the reasons set forth above, we conclude that Defendant received a fair trial, free from error.

NO ERROR.

Judges STEELMAN and HUNTER, JR. concur.